In the
 Missouri Court of Appeals
 Western District

 
 STATE OF MISSOURI, 
 
 Respondent,  WD83426
 v.  OPINION FILED:
 
 FELIPE TORRES ALVAREZ, JR.,  JUNE 29, 2021
 
 Appellant. 
 
 

 Appeal from the Circuit Court of Sullivan County, Missouri
 The Honorable Terry A. Tschannen, Judge

 Before Division One: Anthony Rex Gabbert, Presiding Judge,
 Edward R. Ardini, Jr., Judge, Thomas N. Chapman, Judge

 Felipe Torres Alvarez, Jr. appeals from a judgment entered upon a jury verdict convicting

him of one count of child molestation in the first degree, Section 566.067,1 one count of sodomy

in the first degree, Section 566.060, and one count of rape in the first degree, Section 566.030.

Alvarez contends the circuit court, 1) plainly erred in submitting Instruction No. 6 to the jury,

arguing the verdict director failed to specify a particular incident of hand-to-genital contact or

instruct the jurors that they must unanimously agree on the same incident, 2) plainly erred in

submitting Instruction No. 7 to the jury, arguing the verdict director failed to specify a particular

 1
 All statutory references are to the Revised Statutes of Missouri as updated through 2010, unless otherwise
noted.
incident of sodomy or instruct the jurors that they must unanimously agree on the same incident,

and 3) erred in overruling defense counsel’s motion for judgment of acquittal, arguing there was

insufficient evidence to show beyond a reasonable doubt that Alvarez was the person who

committed the charged crimes against the victim, M.C. We affirm.

 Background and Procedural Information

 Other than to prove identity, Alvarez does not challenge the sufficiency of the evidence to

support his convictions. Viewed in the light most favorable to the verdicts, the evidence at trial

showed that the victim, M.C., was born in July 2003. M.C.’s parents divorced when she was

around one year old. In March 2011, when M.C. was seven years old, M.C.’s mother (Mother)

married Alvarez after knowing him for two to three weeks. Alvarez moved into the residence M.C.

shared with Mother and M.C.’s sixteen-year-old brother (Brother). Within a couple of weeks after

moving in, Alvarez began sexually molesting M.C. by touching her genitals with his hand. Around

Thanksgiving 2011, while M.C. visited her father (Father), she disclosed to her stepsisters that

Alvarez was touching her in that manner. M.C.’s stepsisters then told M.C.’s stepmother. Father

and Stepmother reported the allegations to authorities, and M.C. was interviewed at a Child

Advocacy Center (CAC).

 Prior to M.C.’s scheduled CAC interview, Mother and Brother instructed M.C. to lie during

the interview and claim she had fabricated the allegations against Alvarez; she was told to say that

she made up the story because she and Brother did not like Alvarez and wanted to get rid of him.

 2
M.C. did as she was instructed, and Alvarez eventually moved back into M.C.’s home.2

 After returning to the home, Alvarez initially stayed away from M.C. As time passed,

Alvarez began touching M.C. again in the same manner he had before. M.C. testified that, “it just

started becoming more, like touching, and then it became sexual abuse.” When asked what she

meant by “sexual abuse” M.C. responded, “Being raped.” M.C. could not remember how long it

was after Alvarez moved back into the house that the touching started again, or exactly when it

became “sexual abuse.” She could also not remember the first time she was “raped,” except to

recall that it made her bleed.

 M.C. was asked if the “sexual abuse” began before or after she turned nine years old. M.C.

testified that it was after she turned nine that Alvarez raped her by putting his penis in her vagina

multiple times. On one occasion when she was nine years old, M.C. remembered being “in a lot

of pain” and “there was a lot of bleeding.” She “ran to the bathroom after and there was blood

dripping.” On other occasions M.C.’s stomach or genitals would hurt “really bad” after Alvarez

raped her. Alvarez typically wore a condom when he put his penis in M.C.’s vagina.

 M.C. testified that Alvarez told M.C. that she was not supposed to say anything to anyone

about this conduct or he would hurt her and her family. M.C. believed Alvarez would follow

 2
 In a 2017 interview with police, Mother admitted to telling M.C. to lie in the 2011 CAC interview. Mother
said that she told both M.C. and Brother to lie because Mother was afraid Alvarez would harm her or her children if
he was arrested and went to jail. She told investigators that, “I was always living with fear, always afraid for them. I
did all of this to protect myself and to protect them.” She also told them, “Unfortunately, sometimes we do things that
are bad just to protect them.” Brother was reprimanded by juvenile authorities for the “lie” and had to write Alvarez
an apology.

 At the time of Alvarez’s trial in October 2019, Alvarez resided with Mother and Brother (age twenty-four at
trial) at the same residence M.C. reported that the abuse had occurred. Mother testified that what she previously told
investigators about instructing M.C. to lie was not true, that Alvarez had never been violent, and that investigators had
threatened Mother with deportation if she did not tell them what they wanted to hear. Consequently, she told them
“what they wanted to hear.” Brother testified that he was telling the truth in 2011 when he said that he told M.C. to
say that she was being sexually abused by Alvarez so that they could get rid of Alvarez.

 3
through with that threat “because he’s a violent man.” M.C. described that Alvarez hit Mother

“many times” leaving bruises, and also kicked Mother. When asked if Alvarez ever did anything

to hurt M.C., M.C. testified that he would slap her in the face and pull her hair. If Alvarez caught

M.C. talking to boys, he would get angry, slap M.C., and warn her that she was not supposed to

talk to other people. Sometimes Alvarez would pull M.C.’s hair to “force” her “to perform oral on

him.”

 M.C. testified that Alvarez would force M.C. to “perform oral” on him by putting his penis

in her mouth, grabbing M.C. by the hair, and moving her head back and forth. Alvarez sometimes

ejaculated into M.C.’s mouth and made her swallow it. M.C. testified that, “It was really gross. It

made me gag a lot.” Alvarez would also put his penis in M.C.’s mouth during times M.C. was

menstruating. These incidents occurred when M.C. was in her sixth and seventh grade years in

school. M.C. testified that Alvarez subjected her to sexual abuse “almost every day.” When asked,

“Was it in the same room or same place, or different place, or did it really matter where you were?”,

M.C. responded, “It didn’t really matter where it was.”

 M.C. testified that, at times the sexual assaults were unexpected, and other times

predictable. M.C. explained that they were predictable in the sense that she could tell “it was about

to happen” because he would “look around and see if someone was around” and grab his penis

over his pants.

 M.C. recalled Halloween 2015 when she was in the seventh grade and had arrived home

from trick-or-treating with her best friend. M.C. was wearing a mime costume that was purchased

from Wal-Mart. M.C.’s friend was going to spend the night and had gone upstairs to take off her

makeup. After the friend went upstairs, Alvarez went into M.C.’s room, pushed her onto the bed,

pulled her shorts and underwear off, and forced his penis in her vagina. M.C. was crying. When

 4
Alvarez heard M.C.’s friend walking to the stairway, Alvarez stopped, pulled his pants up, and

walked out. M.C. pulled her shorts back up and was wiping her tears as her friend walked in the

room. M.C. did not disclose to the friend what had occurred.

 Alvarez tracked M.C.’s menstrual cycle. Upon arriving home from school one day, Alvarez

asked M.C. if her menstrual cycle had started. When she told him it had not, Alvarez panicked

and called M.C.’s mother to purchase a pregnancy test or “Plan B” pill. Alvarez told M.C.’s mother

that he was drunk one night and M.C. “hopped” on him and had sex with him. In 2017, Mother

admitted to investigators that she purchased a pregnancy test for M.C. at Alvarez’s request. Mother

told investigators that Alvarez had said that he could not remember if he had sex with M.C.3

 The sexual assaults continued until M.C. went with Father on vacation to Mexico in May

2016. The final assault occurred in May 2016. Alvarez held M.C.’s hands over her head, pushed

her on the bed, and raped her. He stopped when he received a telephone call from M.C.’s mother.

M.C. testified that, although Alvarez collected disability due to having fallen off of a ladder in

2012 and breaking his arm and wrist, he could actually use his right arm and hand and used it to

pull her clothing off at times and hold her hands above her head during assaults.

 When M.C. returned from vacation with Father, she advised Father that she did not want

to go back to Mother’s home. She asked if she could live with an aunt so that she could remain in

the same school district. Father advised M.C. that she needed to live with him if she was not going

to live with Mother. Mother agreed to allow M.C. to live with Father.

 3
 A 2016 CAC interview with M.C. that occurred after she disclosed the abuse the second time was also
introduced into evidence. Therein M.C. discussed that she was very stressed out about getting good grades, but with
“all of the stuff going on at home,” she often would not do her homework. M.C. stated that, due to stress, her “periods”
often would not start and Alvarez would have to keep giving her pregnancy tests.

 5
 M.C. experienced adjustment difficulties in her new school and Father enrolled M.C. in

counseling. Father testified that he believed something was “going on” with M.C. but she would

not talk to them or tell them why she refused to go “home.” He thought she would be more

comfortable talking with a counselor. M.C. disclosed Alvarez’s abuse to a school counselor in

October 2016, and was interviewed in December 2016 by the CAC where she further disclosed

the abuse.

 The State charged Alvarez with two counts of first-degree child molestation (Counts I and

IV), one count of first-degree sodomy (Count II), two counts of first-degree rape (Counts III and

V) and one alternative count of first-degree statutory rape (Count VI). Alvarez was also charged

as a prior and persistent offender for, 1) having been found guilty of the felony of Sexual Assault

in the Second Degree in 1991 in the State of Texas, 2) pleading guilty in 1994 to the felony of

Attempted Murder in the State of Texas, and 3) pleading guilty in 2008 to the felony of Failure to

Comply with Sex Offender Registration Requirements in the State of Texas. Alvarez was tried by

a jury October 16-18, 2019. At the close of the evidence, the court sustained motions for judgment

of acquittal on Counts III and IV (finding that there was no evidence presented that Alvarez used

“forcible compulsion” as charged in Count III when he had sexual intercourse with M.C. during

the time frame of M.C.’s sixth grade year in school, or that Alvarez also touched M.C.’s vagina

with his hand during the 2015 Halloween incident as charged in Count IV), and then renumbered

the counts for purposes of instructing the jury. As renumbered, the jury found Alvarez guilty on

Counts I (first-degree child molestation), II (first-degree sodomy), and III (forcible rape). The

court sentenced Alvarez to ten years of imprisonment on Count I, life without parole on Count II,

and twenty-five years on Count III, with the sentences to run consecutively.

 This appeal follows.

 6
 Preservation

 Alvarez concedes that Points I and II were not preserved and requests plain error review.

“Issues that were not preserved may be reviewed for plain error only, which requires the reviewing

court to find that manifest injustice or a miscarriage of justice has resulted from the trial court

error.” State v. Baumruk, 280 S.W.3d 600, 607 (Mo. banc 2009). Review for plain error involves

a two-step process: the first step requires a determination of whether the claim of error facially

establishes substantial grounds for believing that manifest injustice or miscarriage of justice has

resulted; if plain error is found, the court then must proceed to the second step and determine

whether the claimed error resulted in manifest injustice or a miscarriage of justice. Id.; Rule 30.20.

All prejudicial error is not plain error, “and plain errors are those which are evident, obvious and

clear.” Baumruk, 280 S.W.3d at 607 (internal citations and quotation marks omitted).

 “Instructional error rarely rises to the level of plain error.” State v. Scott, 278 S.W.3d 208,

212 (Mo. App. 2009). For a defendant to establish plain error from an instructional error, he “must

show more than mere prejudice and must show that the circuit court has so misdirected or failed

to instruct the jury that it is apparent to the appellate court that the instructional error affected the

jury’s verdict, and caused manifest injustice or miscarriage of justice.” Id. (internal citation and

quotation marks omitted).

 The State argues that Alvarez waived plain error review by collaborating on the wording

of the verdict directors, jointly proffering the instructions, and then agreeing to their submission

to the jury. In State v. Clay, 533 S.W.3d 710, 715 (Mo. banc 2017), the Missouri Supreme Court

held that, while a defendant does not waive plain error review by failing to object to a faulty jury

instruction or failing to submit a correct one, a defendant cannot ‘“take advantage of self-invited

error or error of his own making.”’ (citing State v. Celis-Garcia, 344 S.W.3d 150 (Mo. banc 2011),

 7
and quoting State v. Bolden, 371 S.W.3d 802, 806 (Mo. banc 2012)). Consequently, a “defendant

invites error and waives appellate review of a claim of instructional error when the defendant

jointly proffers an erroneous instruction.” Id. Alvarez disagrees that the verdict directors were

jointly proffered. Although acknowledging that he “did not object to the verdict directors as they

were finalized following an off the record discussion,” he argues that “acquiescing is not the same

as ‘collaborating.’” Alvarez further argues that State v. Celis-Garcia, 344 S.W.3d at 157, granted

plain error review “on this very issue.”

 The record shows the following with regard to the submission of the jury instructions:

 THE COURT: Okay. All right. I’d like to see counsel back in the
 chamber room real quick and let’s talk for a few minutes so
 we all know what we need to do.

 (THE NOON RECESS TAKEN AT 12:16 P.M.)

 ***

 THE COURT: The Court’s going back on the record in the matter of
 State of Missouri and Felipe Torres Alvarez, Jr.

 Let the record reflect that the parties are finalizing
 their jury instructions with the panel or the jury not being
 seated at this time.

 Gentlemen, we’ve already read Instruction 1 and 2.
 We’ll start with Instruction Number 3. My understanding is
 we’re going to give MAI-CR 4th 402.03.

 Is that your understanding, [Prosecutor]?

 [PROSECUTOR]: Yes.

 THE COURT: And [Defense Counsel]?

 [DEFENSE COUNSEL]: Yes.

 THE COURT: My understanding is that we’re going to give
 Instruction Number 5. It will be MAI-CR 4th 404.12.

 8
 [Prosecutor]?

 [PROSECUTOR]: Yes.

 THE COURT: [Defense Counsel]?

 [DEFENSE COUNSEL]: Yes.

 THE COURT: Instruction Number 6 will be MAI-CR 3rd 320.17.

 [Prosecutor]?

 [PROSECUTOR]: That’s Count I, child molestation in the first degree;
 right?

 THE COURT: It is.

 [PROSECUTOR]: Okay.

 [DEFENSE COUNSEL]: Agreed.

 THE COURT: Instruction Number 7 will be MAI-CR 3rd 320.60.
 Again, that’s Instruction Number 7 and that’s sodomy in the
 first degree.

 [PROSECUTOR]: Yes.

 [DEFENSE COUNSEL]: Yes.

 ***

 Given the record, we are inclined to agree that the State and Alvarez collaborated on the

instructions and that the jury instructions were jointly proffered. The proposed instruction

corresponding to Instruction No. 6, which was filed by the State nearly a year prior to trial, was

not the same instruction presented to the jury. The instruction first proposed by the State included

the language, “Fourth, that the defendant did so as part of a ritual or ceremony in that this was an

act performed as part of a series of sexual acts between M.C. and the defendant as part of an

 9
established or prescribed pattern of activity.” This language was removed from the Instruction No.

6 that was agreed to by both parties, revealing that changes to the jury instructions were made and

agreed to by the parties prior to submission to the jury.

 With regard to Alvarez’s argument that Celis-Garcia granted plain error review on this very

issue, we note that the Supreme Court in State v. Clay expressly stated that Celis-Garcia was not

a case involving jointly proffered instructions. 533 S.W.3d at 715. Beyond this, Celis-Garcia’s

guidance regarding verdict directors in a “multiple acts” case has been settled law now for nearly

a decade. We stated in State v. Adams, 571 S.W.3d 140, 144 n.3 (Mo. App. 2018):

 Though Celis-Garcia found plain error, notwithstanding the defendant’s
 tender of verdict directors that suffered the same defect as those submitted by the
 state, defendants in future multiple acts cases should not presume that they will
 enjoy a perpetual free pass to secure plain error review in these cases.
 Notwithstanding that the right to a unanimous jury verdict is an important
 constitutional principle, Celis-Garcia has been settled law for several years,
 rendering it more and more difficult to excuse a defendant's failure to object to, and
 thus preserve, instructional error in multiple acts cases.

 Nevertheless, in the event the challenged instructions were not jointly proffered, we

proceed with plain error review.

 Point I - Instruction No. 6

 In his first point on appeal, Alvarez contends that the circuit court plainly erred in

submitting Instruction No. 6 to the jury, arguing that the verdict director failed to specify a

particular incident of hand-to-genital contact or instruct the jurors that they must unanimously

agree on the same incident, and the State presented evidence of multiple acts of hand to genital

contact between Alvarez and M.C. Alvarez contends that because Instruction No. 6 did not specify

any of these incidents, it was unclear as to which incident Alvarez was found guilty, allowing for

the possibility that the jurors failed to unanimously find guilt with regard to the same incident.

 10
 Instruction No. 6 stated:

 INSTRUCTION No. 6

 As to Count One, if you find and believe from the evidence beyond a
 reasonable doubt:

 First, that between March 28, 2011 and November 30, 2011, in the State of
 Missouri, the defendant touched the genitals of M.C., and

 Second, that defendant did so for the purpose of arousing defendant’s sexual
 desire, and

 Third, that M.C. was a child less than twelve years old,

 then you will find the defendant guilty under Count One of child molestation in the
 first degree.

 However, unless you find and believe from the evidence beyond a
 reasonable doubt each and all of these propositions, you must find the defendant
 not guilty of that offense.

 Although Alvarez disputes the propriety of Instruction No. 6 on the grounds that there was

evidence of “multiple, separate incidents of a sexual act” presented with regard to this count,

Alvarez points to no singly identifiable separate incident or incidents that the State could have

chosen from to set forth in the verdict director. Alvarez blends the entirety of the evidence from

2011 to 2016 in making his argument, ignoring that Instruction No. 6 regards only an eight-month

period in 2011 – the time between when Alvarez and Mother were first married to when M.C. first

reported to step-siblings that Alvarez was touching her genitals.

 With regard to only this time frame, M.C. testified that she was seven or eight years old at

the time and Alvarez would rub his hands on her thighs, “touch my butt,” and “touch my genitals,”

which she explained was her “vagina.” She described that Alvarez’s actions made her feel

uncomfortable, but that she “was just a kid” and “didn’t know if that was supposed to happen.”

 11
When asked where this occurred, M.C. testified that it was in Milan “in the house that I lived in.”

M.C. testified to confiding this “secret” with a step-sister who, to M.C.’s surprise, revealed the

secret to siblings and M.C.’s step-mother.

 Except for testimony from other individuals regarding what M.C. reported to them had

happened, the only other evidence at trial regarding this time frame was M.C.’s 2011 forensic

interview and M.C.’s 2016 forensic interview. In the 2011 interview, the forensic interviewer asks

M.C. if there are any places on a girl’s body that somebody should not touch. M.C. circled, among

other things, the vaginal area on an anatomical drawing of a female child. The interviewer then

asked M.C. to mark with an X the places that somebody had touched her. M.C. marked the vagina.

The forensic interviewer then began asking M.C. about marking the vagina on the picture. M.C.

paused and said, “Never mind.” She explained to the interviewer that she had been confused with

the interviewer’s question.

 In the 2016 forensic interview, M.C. recalled the prior interview and when she had marked

the vaginal and breast areas with an X. She stated that Alvarez had, in fact, touched her in those

areas prior to that interview, but she had been told by Mother to lie about it so she did. She stated

that Mother did not believe her, thought she was trying to get attention, and told her, “Doing this

isn’t going to get you attention.”4 M.C. also testified at trial that Alvarez did, in fact, touch her

genitals with his hand after he moved into the family home upon marrying Mother in March 2011,

 4
 M.C. also stated in the 2016 interview that, after she moved to Father’s home, Brother spoke to her on the
telephone and told her that people had found out about what was going on in Mother’s home between M.C. and
Alvarez. Brother talked M.C. into calling Mother who sounded depressed and sad. M.C. could hear Alvarez in the
background yelling, so she got off the telephone. When asked if M.C. felt safe with Brother, M.C. stated that she did
not. She stated that Brother had changed a lot since M.C. moved out of the house, and Brother now hated her. M.C.
appeared very emotional throughout the interview and cried while discussing that she missed Mother and that her two
brothers now hated her.

 12
and that she was told by Mother and Brother to lie about it. Further, that the abuse temporarily

stopped after she reported it around Thanksgiving of 2011.

 The Missouri and federal constitutions require that a jury verdict in a criminal case

involving a serious offense be unanimous. MO. CONST. art I, § 22(a); U.S. Const. amend. VI;

Ramos v. Louisiana, 140 S.Ct. 1390 (2020). “For a jury verdict to be unanimous, the jurors must

be in substantial agreement as to the defendant's acts, as a preliminary step to determining guilt.”

Celis-Garcia, 344 S.W.3d at 155 (internal quotes and citation omitted). The jury unanimity issue

sometimes arises in “multiple acts” cases. Id. “A multiple acts case arises when there is evidence

of multiple, distinct criminal acts, each of which could serve as the basis for a criminal charge, but

the defendant is charged with those acts in a single count.” Id. at 155-56. To determine if a case

is a multiple acts case, courts consider, “(1) whether the acts occur at or near the same time; (2)

whether the acts occur at the same location; (3) whether there is a causal relationship between the

acts, in particular whether there was an intervening event; and (4) whether there is a fresh impulse

motivating some of the conduct.” Id. at 156 (quoting AM.JUR.75B 2D Trial § 1511).

 Here, while the evidence suggests that Alvarez touched M.C.’s genitals more than once

between March 28, 2011 and November 30, 2011, the only location identifiable in the record for

these occurrences is M.C.’s home that she shared with Alvarez, Mother, and Brother in Milan, and

no separate acts are particularized at all. Notably, although Alvarez contends that the trial court

“plainly erred” by failing to “specify a particular incident or instruct the jurors that they must

unanimously agree on the same incident,” Alvarez points to no “particular incident” that could

have been identified to instruct the jury. He only generically and/or broadly discusses the entirety

of the evidence and the verdict directors, and does not acknowledge narrowed time frames, specific

locations, specific acts, etc., already articulated within the verdict directors and identify the

 13
particularized, multiple acts occurring within the confines of the verdict directors from which his

claims emanate. Under plain error review, the appellant still bears the burden of establishing

manifest injustice. State v. Brandolese, 601 S.W.3d 519, 526 (Mo. banc 2020). “It is not the duty

of this Court to become an advocate for the appellant and comb through the entire record searching

for the basis of claimed error.” State v. Bradley, 8 S.W.3d 905, 906 (Mo. App. 2000).

 Moreover, upon our own review of the evidence, we find that the jury could not have been

confused with regard to which specific incident the jury was agreeing Alvarez committed where

there were no specific incidents in evidence. The jury was ultimately tasked with determining

whether, during the eight-month time frame of March 28, 2011 to November 30, 2011, and while

in the State of Missouri, Alvarez touched M.C.’s genitals for the purpose of arousing Alvarez’s

sexual desire, and that M.C. was a child less than twelve years of age at the time. The jury

unanimously agreed that Alvarez had done so. The fact that different acts of hand-to-genital child

molestation could theoretically have been relied on by the jurors in finding Alvarez guilty “cannot

demonstrate a violation of the right to a unanimous verdict when the record contains no evidentiary

basis for the jurors to distinguish between those acts.” State v. Walker, 549 S.W.3d 7, 12 (Mo.

App. 2018).

 Alvarez fails to surpass the first prong of plain error review and meet his burden of facially

establishing that manifest injustice or a miscarriage of justice occurred when the court submitted

Instruction No. 6 to the jury.

 Point I is denied.

 Point II - Instruction No. 7

 In his second point on appeal, Alvarez contends that the circuit court plainly erred in

submitting Instruction No. 7 to the jury, arguing that the verdict director failed to specify a

 14
particular incident of sodomy or instruct the jurors that they must unanimously agree on the same

incident, and the State presented evidence of multiple acts of sodomy between Alvarez and M.C.

Alvarez contends that because Instruction No. 7 did not specify any of these incidents, it was

unclear as to which incident Alvarez was found guilty, allowing for the possibility that the jurors

failed to unanimously find guilt with regard to the same incident.

 Instruction No. 7 stated the following:

 INSTRUCTION No. 7

 As to Count Two, if you find and believe from the evidence beyond a
 reasonable doubt:

 First, that between August 1, 2014 and May 31, 2015, in the State of
 Missouri, the defendant placed his penis in the mouth of M.C., and

 Second, that defendant did so by the use of forcible compulsion, and

 Third, that defendant did so knowingly, and

 Fourth, that, M.C. was a child less than twelve years of age,

 Then you will find the defendant guilty under Count Two of sodomy in the first
 degree under this instruction.

 However, unless you find and believe from the evidence beyond a
 reasonable doubt each and all of these propositions, you must find the defendant
 not guilty of that offense.

 Similar to his argument regarding Instruction No. 6, Alvarez points to the entirety of the

evidence to support his contention that evidence of multiple acts of sodomy were presented at trial.

Yet, while it can be reasonably inferred that Alvarez sodomized5 M.C. in more than one way and

 5
 Sodomy in the first degree pursuant to Section 566.060 is described as a person having “deviate sexual
intercourse with another person who is incapacitated, incapable of consent, or lacks the capacity to consent, or by the
use of forcible compulsion.” Section 566.010(3) defines “Deviate sexual intercourse” as:

 15
at various times over the span of several years, Instruction No. 7 narrows the time frame the

sodomy occurred to between August 1, 2014 and May 31, 2015 (M.C.’s sixth grade year in school),

and identifies the type of “deviate sexual intercourse” charged in Count II as Alvarez placing his

penis in M.C.’s mouth. Hence, although there was indeed evidence that Alvarez sodomized M.C.

when she was in the sixth grade by putting his mouth on M.C.’s genitals when M.C. was either in

her own bedroom or her mother’s bedroom, the jury would not have considered these acts when

contemplating Instruction No. 7, because Instruction No. 7 specifies the “deviate sexual

intercourse” element of the charged sodomy to be Alvarez placing his penis in M.C.’s mouth. A

jury is presumed to follow the jury instructions. State v. Anderson, 539 S.W.3d 823, 834 n.6 (Mo.

App. 2017). Likewise, M.C. testified to Alvarez having sexual intercourse with her while she was

in the sixth grade. The jury would not have considered this evidence when contemplating

Instruction No. 7, because the verdict director involves deviate sexual intercourse (sodomy), not

sexual intercourse (rape).6

 When reviewing the evidence of Alvarez placing his penis in M.C.’s mouth between the

dates of August 1, 2014 and May 31, 2015, we find no multiple, distinct acts that can be separately

 ‘Deviate sexual intercourse,’ any act involving the genitals of one person and the hand, mouth,
 tongue, or anus of another person or a sexual act involving the penetration, however slight, of the
 penis, female genitalia, or the anus by the finger, instrument or object done for the purpose of
 arousing or gratifying the sexual desire of any person or for the purpose of terrorizing the victim[.]
 6
 Alvarez does not challenge his conviction for first-degree rape. Although there was evidence of multiple
incidents of Alvarez raping M.C. spanning from approximately 2012 to 2016, including a specific incident when M.C.
was nine years old where Alvarez raped M.C. on her mother’s bed that resulted in M.C. bleeding badly, the charge
and verdict director for the rape conviction specified only the Halloween incident occurring on October 31, 2015,
when M.C. was in the seventh grade. Alvarez was also charged with committing rape in the first degree against M.C.
between August 1, 2014 and May 31, 2015, but the court granted a directed verdict to Alvarez on that count finding
there was no evidence of sexual intercourse with forcible compulsion during that alleged time frame as was charged.
As noted previously, the court also granted a directed verdict to Alvarez on a count that alleged Alvarez touched
M.C.’s vagina with his hand during the 2015 Halloween incident. While there was evidence that Alvarez’s penis
penetrated M.C.’s vagina during that incident and that Alvarez used forcible compulsion, the court concluded that
there was no evidence that Alvarez also touched M.C.’s genitals with his hand during that rape.

 16
identified by date, varied location, or any other distinguishing factor, and Alvarez supplies us with

none.

 M.C. first testified to Alvarez placing his penis in M.C.’s mouth after she had already

testified that what started out as Alvarez touching M.C.’s thighs, buttocks, and genitals later led to

“sexual abuse” which she identified as “being raped.” (M.C. defined both “sexual intercourse”

and “rape” in her testimony as, “his penis in my vagina.”) When asked if she remembered anything

about the first time the sexual abuse or rapes happened she stated, “I remember that he made me

bleed.” She believed that she was nine years old at the time and that it occurred on her “mom’s

bed.” M.C. then described how Alvarez told her not to tell anyone or he would hurt M.C. and her

family, and that M.C. believed him because of the violence she regularly observed Alvarez display

against Mother.

 M.C. was then asked, “… When this first started, the sexual abuse or the rapes, did he ever

do anything to you to hurt you?” M.C. stated that sometimes he would hit her and pull her hair.

M.C. was asked if any of that occurred when Alvarez sexually abused or raped M.C. She

responded, “Sometimes he’d just pull my hair to force me.” When asked what she was forced to

do, M.C. replied, “To perform oral on him” which M.C. described as, “His penis in my mouth.”

M.C. was then asked if Alvarez ever pulled her hair or slapped her when he wanted her to have

sex with him, and she responded that he had. M.C. testified that the “sexual abuse” happened

many times, “almost every day.”7

 7
 In M.C.’s 2016 forensic interview, she discusses that Alvarez first started putting his penis in her mouth
when she was seven or eight years old. He would also make her perform “oral” on him during times she was
menstruating. She states that her “period” started when she was in the fourth grade. When specifically discussing her
seventh-grade year in school, M.C. states that some form of sexual abuse happened nearly every day and any time she
was home alone. M.C. describes two specific incidents of Alvarez putting his penis in her mouth when she was in the
seventh grade -- once after she had just arrived home from school, and once before school. In the before school
incident, Alvarez also raped her. These seventh-grade incidents would have been excluded from consideration by the

 17
 M.C. was then asked a series of questions regarding if there was any “routine” to Alvarez’s

actions and/or if his behaviors were predictable. M.C. explained that it was predictable in the

sense that she would observe Alvarez look around to ensure no one else was there, grab his penis,

and then approach her, but other times “it was unexpected.” When asked if these events took place

“in the same room or same place, or different place, or did it really matter where you were?”, M.C.

responded, “It didn’t really matter where it was.” M.C. was then asked if she had a specific

memory of a time Alvarez raped her, and M.C. proceeded to describe the October 31, 2015, post

trick-or-treating rape which occurred in M.C.’s bedroom.

 M.C. was later asked if any “sexual intercourse” occurred the year prior, “when you were

in the sixth grade.” Upon responding in the affirmative, M.C. was asked, “Did that involve any

oral sex?” M.C. responded, “Yes.” Thereafter, M.C. was asked about “any memories of any time

that he performed oral sex on you?” M.C. responded in the affirmative and described that Alvarez

would pull her shorts off, to which she would try kicking him off but he would fight back. She

testified that this happened in both her bedroom and her mother’s bedroom. M.C. was asked again

if she ever remembered “being hurt during any of this.” M.C. then discussed being in a lot of pain

on the occasion when she was nine years old and Alvarez had sex with her on M.C.’s mother’s bed

and “there was a lot of bleeding.”

 After discussing this situation and other times M.C. endured pain after sexual intercourse

with Alvarez, M.C. was asked, “The times that he made you perform oral sex on him, what do you

remember about that?” M.C. responded with, “He had pulled me by my hair … And made me

give him oral … Sometimes he would ejaculate in my mouth … It was really gross. It made me

jury as Instruction No. 7 was narrowly tailored to address only incidents occurring during M.C.’s sixth-grade year in
school.

 18
gag a lot.” She stated that this happened many times. When asked, “Do you think that happened

when you were in the sixth grade?”, M.C. responded, “Yes.”

 We find that Alvarez fails to meet his burden of facially establishing that manifest injustice

or a miscarriage of justice occurred when the court submitted Instruction No. 7 to the jury. Alvarez

points to no evidence in the record of multiple, particularized acts of Alvarez placing his penis in

the mouth of M.C. between the dates of August 1, 2014 and May 31, 2015 (M.C.’s sixth-grade

year in school), such as would require an instruction drafted more narrowly than the one given.

While M.C. testified that Alvarez placed his penis in her mouth “many times” and that it happened

when she was in the sixth grade (which corresponds to Instruction No. 7’s designation of August

1, 2014 to May 31, 2015), no specific room in the house was ever given for where the penis-to-

mouth contact occurred during that time frame, and no other particulars were given so as to identify

any specific incident. Moreover, the jury could not have been confused with regard to which

specific incident the jury was agreeing Alvarez committed where there were no specific incidents

in evidence. The jury was tasked with determining whether, during the ten-month time frame of

August 1, 2014 to May 31, 2015, and while in the State of Missouri, Alvarez, using forcible

compulsion, knowingly placed his penis in the mouth of M.C., a child less than twelve years of

age. The jury unanimously agreed that he had done so. The fact that different acts of penis-to-

mouth sodomy could theoretically have been relied on by the jurors in finding Alvarez guilty

“cannot demonstrate a violation of the right to a unanimous verdict when the record contains no

evidentiary basis for the jurors to distinguish between those acts.” Walker, 549 S.W.3d at 12.

 Point II is denied.

 Point III – Identification

 19
 In his third point on appeal, Alvarez contends that the circuit court erred in overruling

defense counsel’s motion for judgment of acquittal at the close of the evidence arguing there was

insufficient evidence to show beyond a reasonable doubt that Alvarez was the person who

committed the charged crimes against M.C. Alvarez contends that M.C. was never shown a picture

of Alvarez and she never identified Alvarez as the perpetrator of the crimes in court. Alvarez

argues that, because M.C. was never asked to identify him either inside or out of court, the evidence

was insufficient to support that he was the individual responsible for the crimes against M.C.

 When examining a sufficiency challenge, we consider only the legal question of “whether,

after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt.” State v. Zetina-

Torres, 482 S.W.3d 801, 809 (Mo. banc 2016) (internal quotation marks and citations omitted).

We accept as true all evidence and reasonable inferences that support the conviction, ignore all

evidence and inferences to the contrary, and do not reweigh the evidence. State v. Gilmore, 537

S.W.3d 342, 344 (Mo. banc 2018). “The evidence at trial must show defendant was the person

who committed the crime, but an in-court identification is not always required.” State v. Couch,

793 S.W.2d 599, 605 (Mo. App. 1990). “Each case is to be examined on its own facts looking at

the totality of the circumstances.” Id.

 Here, Alvarez was present in the courtroom throughout jury selection and trial. He was

identified as the “defendant” and introduced by the State and defense counsel as “Felipe Torres

Alvarez, Jr.,” “Felipe Alvarez,” “Mr. Alvarez,” and “Felipe.” M.C. testified that Mother’s last

name was “Alvarez” and that Mother was married to Felipe, which she pronounced as “Phillip.”

When asked how to spell “Phillip,” M.C. responded, “F-E-L-I-P-E.” Alvarez was referenced

throughout the trial as M.C.’s “stepdad.” M.C. testified that Alvarez moved into the family home

 20
at 209 Mineral Lane in Milan just before Alvarez and M.C.’s mother married and that, thereafter,

M.C., Mother, Brother, and Alvarez resided together. M.C. testified that it was at this residence

that Alvarez raped, sodomized, and sexually abused her.

 Mother testified that she was M.C.’s mother and that she married Felipe Alvarez on March

28, 2011, after knowing him for two to three weeks. Alvarez moved into the family home at that

time. Mother testified that she had resided at 209 Mineral Lane in Milan, Missouri, for nine years,

and that she continued to live there with Alvarez and Brother.

 Alvarez was the sole defendant on trial. The identity of the alleged perpetrator was never

raised as an issue until after the close of evidence; Alvarez’s defense was that M.C.’s testimony

lacked credibility because she would have shown physical injuries based on the extent of abuse

she claimed to have suffered, she had previously recanted a claim of sexual abuse by Alvarez,

Alvarez was physically disabled and could not have used forcible compulsion during assaults,

M.C. testified differently to various things at a preliminary hearing, and there was nothing to

corroborate M.C.’s claims. Further, that any prior statements Mother made that might have

implicated Alvarez were due to duress from law enforcement and threats of deportation.

 The circuit court did not err in overruling Alvarez’s motion for judgment of acquittal as

there was sufficient evidence from which a reasonable juror could conclude, beyond a reasonable

doubt, that the defendant on trial, Felipe Torres Alvarez, Jr., was M.C.’s stepdad, Mother’s

husband, and the same individual referenced throughout the evidence at trial as having molested,

sodomized, and raped M.C.

 Point III is denied.

 Conclusion

 21
 We conclude that Alvarez fails to meet his burden of facially establishing that manifest

injustice or a miscarriage of justice occurred when the court submitted Instruction No. 6 to the

jury. Alvarez points to no evidence in the record of multiple, particularized acts of Alvarez

touching M.C.’s genitals between the dates of March 28, 2011 and November 30, 2011, such as

would require an instruction drafted more narrowly than the one submitted. Further, Alvarez fails

to meet his burden of facially establishing that manifest injustice or a miscarriage of justice

occurred when the court submitted Instruction No. 7 to the jury. Alvarez points to no evidence in

the record of multiple, particularized acts of Alvarez placing his penis in the mouth of M.C.

between the dates of August 1, 2014 and May 31, 2015, such as would require an instruction

drafted more narrowly than the one submitted. Finally, the circuit court did not err in overruling

Alvarez’s motion for judgment of acquittal as there was sufficient evidence from which a

reasonable juror could conclude, beyond a reasonable doubt, that the defendant on trial, Felipe

Torres Alvarez, Jr., was M.C.’s stepdad, Mother’s husband, and the same individual referenced

throughout the evidence at trial as having molested, sodomized, and raped M.C.

 The circuit court’s judgment is affirmed.

 Anthony Rex Gabbert, Judge

All concur.

 22